

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

- - - - - - - - - - - - - - - - - - - - - - - x

United States of America,

               Plaintiff,

     v.

VOLKSWAGEN AG,

               Defendant.

:  No. 16-CR-20394
:
:
:  HONORABLE SEAN F. COX
:
:
:  Offenses:  (1) Conspiracy
:                   (2) Obstruction of Justice
:                   (3) Entry of Goods by
:                         False Statement
:
:  Violations:  (1) 18 U.S.C. § 371
:                    (2) 18 U.S.C. § 1512(c)
:                    (3) 18 U.S.C. § 542
:
:  Statutory Maximum Period of
:  Probation:
:  Five years per count
:
:  Statutory Minimum Period of
:  Probation:
:  None/Not Applicable
:
:  Statutory Maximum Fine:  18 U.S.
:  § 3571(d) (the greater of twice the
:  gross gain or twice the gross loss)
:
:  Statutory Minimum Fine:  None/Not
:  Applicable



- - - - - - - - - - - - - - - - - - - - - - - x

1


GOVERNMENT
EXHIBIT
1

**Rule 11 Plea Agreement**

The United States of America, by and through the Department of Justice, Criminal Division, Fraud Section, the United States Attorney's Office for the Eastern District of Michigan, and the Department of Justice, Environment and Natural Resources Division, Environmental Crimes Section and with the approval of the Deputy Attorney General (collectively hereafter, "the Offices"), and the Defendant, Volkswagen AG (the "Defendant"), by and through its undersigned attorneys, and through its authorized representative, pursuant to authority granted by the Defendant's Management Board, with the consent of the Supervisory Board, hereby submit and enter into this plea agreement (the "Agreement"), pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.  The terms and conditions of this Agreement are as follows:

1.    **Guilty Plea**

   A.    **Waiver of Indictment and Venue**

   Pursuant to Fed. R. Crim. P. 7, the Defendant agrees to knowingly waive its right to grand jury indictment and its right to challenge venue in the United States District Court for the Eastern District of Michigan, and to plead guilty to Counts One through Three of the Third Superseding Information.

   B.    **Counts of Conviction**

   The Third Superseding Information charges three counts:  (1) Count One - conspiracy in violation of 18 U.S.C. § 371, (2) Count Two - obstruction of justice in

2

violation of 18 U.S.C. § 1512(c), and (3) Count Three – introducing imported merchandise into the United States by mean of false statements in violation of 18 U.S.C. § 542. The Defendant further agrees to persist in that plea through sentencing and, as set forth below, to cooperate fully with the Offices in their investigation into the conduct described in this Agreement and other conduct related to the introduction into the United States of diesel vehicles with defeat devices as defined under U.S. law.

C. **Elements of Offenses**

The elements of Count One (conspiracy) are as follows:

(1) The elements for conspiracy to defraud the United States by obstructing the lawful function of the federal government are as follows:

(a) That two or more persons conspired, or agreed, to defraud the United States or one of its agencies or departments, in this case, the Environmental Protection Agency (EPA), by dishonest means;

(b) That the defendant knowingly and voluntarily joined the conspiracy; and

(c) That a member of the conspiracy did one of the overt acts described in the indictment for the purpose of advancing or helping the conspiracy.

(2)     The elements for conspiracy to violate the wire fraud statute and Clean Air Act are as follows:

(a)     That two or more persons conspired, or agreed, to commit a crime, in this case, a violation of the wire fraud statute (18 U.S.C. § 1343) and the Clean Air Act (42 U.S.C. § 7413(c)(2)(A)) as described below;

(b)     That the defendant knowingly and voluntarily joined the conspiracy; and

(c)     That a member of the conspiracy did one of the overt acts described in the indictment for the purpose of advancing or helping the conspiracy.

*Object of the Conspiracy – Wire Fraud – 18 U.S.C. § 1343*:

(a)     The defendant knowingly participated in, devised, or intended to devise a scheme to defraud in order to obtain money or property;

(b)     The scheme included a material misrepresentation or concealment of a material fact;

(c)     The defendant had the intent to defraud; and

4

(d)     The defendant used (or caused another to use) wire, radio or television communications in interstate or foreign commerce in furtherance of the scheme.

*Object of the Conspiracy – Clean Air Act – 42 U.S.C. § 7413(c)(2)(A)*

(a)     The defendant knowingly made (or caused to be made) a false material statement, representation, or certification, or omission of material information;

(b)     The statement, representation or certification that was made (or omitted), or caused to be made or omitted, was in a notice, application, record, report, plan or other document required to be filed or maintained under the Clean Air Act; and

(c)     The statement, representation, certification, or omission of information, was material.

The elements of Count Two (obstruction of justice) are as follows:

(1)     That the defendant altered, destroyed, mutilated, or concealed a record, document or other object;

(2)     That the defendant acted knowingly;

(3)     That the defendant acted corruptly; and

(4)     That the defendant acted with the intent to impair the record, document or object's integrity or availability for use in an official proceeding.

The elements of Count Three (entry of goods by false statement) are as follows:

(1)    That merchandise was imported;

(2)    That the defendant entered or introduced merchandise into the commerce of the United States;

(3)    That the defendant did so by means of a false statement, which it knew was false; and

(4)    That the false statement was material to the entry of the merchandise.

D.    **Statutory Maximum Penalties**

The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 371 (Count One) is a fine of $500,000 or twice the gross pecuniary gain or gross pecuniary loss resulting from the offense, whichever is greatest, Title 18, United States Code, Section 3571(c), (d); five years' probation, Title 18, United States Code, Section 3561(c)(1); and a mandatory special assessment of $400, Title 18, United States Code, Section 3013(a)(2)(B).   The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1512(c) (Count Two) is a fine of $500,000; five years' probation, Title 18, United States Code, Section 3561(c)(1); and a mandatory special assessment of $400, Title 18, United States Code, Section 3013(a)(2)(B).   The statutory maximum sentence that the Court can impose for a violation of Title 18,

United States Code, Section 542 (Count Three) is a fine of $500,000 or twice the gross pecuniary gain or gross pecuniary loss resulting from the offense, whichever is greatest, Title 18, United States Code, Section 3571(c), (d); five years' probation, Title 18, United States Code, Section 3561(c)(1); and a mandatory special assessment of $400, Title 18, United States Code, Section 3013(a)(2)(B).

     E.    **Factual Basis for Guilty Plea**

The Defendant is pleading guilty because it is guilty of the charges contained in the Third Superseding Information. The Defendant admits, agrees, and stipulates that the factual allegations set forth in Exhibit 2 (the Statement of Facts) are true and correct, that it is responsible under the laws of the United States for the acts of its employees described in Exhibit 2, and that the facts set forth in Exhibit 2 accurately reflect the Defendant's criminal conduct and provide a factual basis for the guilty plea. The Defendant agrees that it will neither contest the admissibility of, nor contradict, the Statement of Facts contained in Exhibit 2 in any proceeding.

2.    **Sentencing Guidelines**

     A.    **Standard of Proof**

The Court will find sentencing factors by a preponderance of the evidence.

     B.    **Guideline Range**

There are no disputes with respect to the sentencing guidelines that require resolution by the court. While the Defendant does not adopt, agree or accept the United States Sentencing Guidelines (U.S.S.G.) analysis contained herein, for

purposes of avoiding the need for a contested sentencing proceeding and achieving a just and fair result, and because the Defendant agrees that the overall fine proposed herein achieves such a result, the Defendant does not contest the factual or legal basis of the Office's U.S.S.G. analysis contained in this Paragraph for the purposes of this proceeding and stipulates that the proposed fine constitutes a reasonable sentence under the factors listed in Title 18, United States Code, Section 3553(a). Pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the Court must determine an advisory sentencing guideline range pursuant to the United States Sentencing Guidelines (U.S.S.G.). The Court will then determine a reasonable sentence within the statutory range after considering the advisory sentencing guideline range and the factors listed in Title 18, United States Code, Section 3553(a). The Defendant also understands that if the Court accepts this Agreement, the Court is bound by the sentencing provisions in Paragraph 3. The Offices submit that a faithful application of the U.S.S.G. to determine the applicable fine range yields the following analysis:

a. The 2016 U.S.S.G. are applicable to this matter.

b. <u>Offense Level</u>. Based upon U.S.S.G. § 2B1.1, the total offense level is 41, calculated as follows:

| (a)(1) | Base Offense Level | 7 |
|---|---|---|
| (b)(1)(P) | Amount of Loss > $550 million | +30 |
| (b)(2)(A)(i) | More Than 10 Victims | +2 |
| (b)(10)(B) | Substantial Part of Scheme Committed from Outside the United States | +2 |

8

         **TOTAL**                                                                    41

c.   <u>Base Fine</u>. Based upon U.S.S.G. § 8C2.4(a), the base fine is $8,543,169,187 (the pecuniary loss from the offense caused by the Defendant)

d.   <u>Culpability Score</u>. Based upon U.S.S.G. § 8C2.5, the culpability score is 11, calculated as follows:

| | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (b)(1) | the unit of the organization within which the offense was committed had 5,000 or more employees and an individual within high-level personnel of the unit participated in, condoned, or was willfully ignorant of the offense | +5 |
| (e) | obstruction of justice | +3 |
| (g)(3) | The organization fully cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | - 2 |
| **TOTAL** | | 11 |

<u>Calculation of Fine Range</u>:

| | |
|---|---|
| Base Fine | $8,543,169,187[1] |
| Multipliers | 2 (min)/4 (max) |
| Fine Range | $17,086,338,374 (min)/ $34,172,676,746 (max) |

---

[1] The base fine amount consists of the loss amount as calculated under USSG § 2B1.1 and accompanying Application Notes, discounted to reflect a 50% reduction for the litigation risk that both parties would bear were there a contested sentencing proceeding. *See, e.g.*, *United States v. Giovenco*, 773 F.3d 866 (7th Cir. 2014); *United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012).

3.     **Sentence**

Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and the Defendant agree that the appropriate disposition of this case is as set forth in this Section and agree to recommend jointly that the Court at a hearing to be scheduled at an agreed upon time impose it.

A.     **Relevant Considerations**

The Offices enter into this Agreement based on the individual facts and circumstances presented by this case and the Defendant.   Among the factors considered were the following:

1.     the Defendant did not voluntarily disclose to the Offices the conduct described in Exhibit 2 (the Statement of Facts);

2.     the Defendant cooperated with the Offices' investigation by, among other things, (i) gathering substantial amounts of evidence and performing forensic data collections in multiple jurisdictions; (ii) producing documents, including translations, to the Offices in ways that did not implicate foreign data privacy laws; (iii) collecting, analyzing, organizing, and producing voluminous evidence and information; (iv) interviewing hundreds of witnesses in the United States and overseas; (v) providing non-privileged facts relating to individuals and companies involved in the criminal conduct; and (vi) facilitating and encouraging

cooperation and voluntary disclosure of information and documents by current and former company personnel;

3.    the Defendant has already agreed to compensate members of the class in *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, No. 3:15-md-2672 (N.D. Cal.), which consists of victims of the underlying criminal conduct that is the subject of this Agreement, and to pay into a NOx remediation trust, in an aggregate amount of approximately $11 billion (based on net present value);

4.    despite obstruction of justice committed by certain of the Defendant's employees, principally in the form of document destruction, the Defendant, including through its outside counsel, self-disclosed this conduct to the Offices, remediated the conduct by recovering large portions of the deleted documents through a variety of forensic means, and conducted a thorough investigation of the conduct, the findings of which it reported to the Offices;

5.    the Defendant engaged in remedial measures, including creation of a management board position to supervise the Defendant's legal and compliance functions, reorganization of the whistleblower system, improvements to its risk assessment systems, specific reforms to its engine-related practices, including a program to audit these reforms, termination the employment of six individuals who participated in, or failed to supervise employees who participated in, the misconduct

described in the Statement of Facts, suspending an additional eight individuals who participated in the misconduct described in the Statement of Facts for varying periods, and disciplining an additional three employees who participated in the misconduct described in the Statement of Facts; however, the Defendant's remediation remains incomplete;

6.    the Defendant has committed to continue to enhance its compliance program and internal controls;

7.    the Defendant has agreed, as part of its continuing cooperation obligations, and to ensure that the Defendant and its wholly-owned subsidiary Volkswagen Group of America ("VW GOA") implements an effective compliance program, to the appointment of an independent monitor (the "Monitor") for a period of up to three years, who will have authority with respect to the Defendant and VW GOA;

8.    the nature and seriousness of the offenses;

9.    the Defendant has no prior criminal history;

10.    the Defendant has agreed to continue to cooperate with the Offices in any ongoing investigation of the conduct of the Defendant and its officers, directors, employees, agents, business partners, and consultants relating to the violations to which the Defendant is pleading guilty; and

11.    the Defendant has agreed to pay an additional $1,500,000,000 to the United States to resolve claims for civil penalties arising from the underlying conduct that is the subject of this Agreement;

12.    accordingly, after considering (1) through (11) above, (a) the Defendant received an aggregate discount of approximately 20% off of the bottom of the otherwise applicable U.S. Sentencing Guidelines fine range, reflecting its cooperation in the investigation, and (b) after application of the foregoing discount, the Defendant in addition received a credit of $11 billion, representing the net present value of the Defendant's settlements with consumers and payments to the NOx remediation trust in settlement of civil litigation.

B.    **Fine**

The Defendant shall pay to the United States a criminal fine of $2,800,000,000, payable in full within ten days of the entry of judgment following the sentencing hearing in this matter.  The Defendant shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the penalty amount that the Defendant pays pursuant to this Agreement.  The Defendant further agrees that it shall not claim, assert, or apply for, either directly or indirectly, any tax deduction, tax credit, or any other offset with regard to any U.S. federal, state, or local tax or taxable income for any fine or forfeiture paid pursuant to this Agreement.

13

C.     **Probation**

The parties agree that a term of organizational probation for a period of three years should be imposed on the Defendant pursuant to 18 U.S.C. §§ 3551(c)(1) and 3561(c)(1). The parties further agree, pursuant to U.S.S.G. § 8D1.4, that the term of probation shall include as conditions the obligations set forth in Paragraphs 5 and 6 below as well as the payment of the fine set forth in this Paragraph, but shall not include the obligations set forth in Paragraph 7 below.

D.     **Special Assessment**

The Defendant shall pay to the Clerk of the Court for the United States District Court for the Eastern District of Michigan within ten days of the time of sentencing the mandatory special assessment of $1,200 ($400 per count).

E.     **Restitution**

No order of restitution is appropriate in this case pursuant to 18 U.S.C. § 3663A(c)(3), as the number of identifiable victims is so large as to make restitution impracticable and/or determining complex issues of fact related to the cause or amount of victims' losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.  Moreover, as noted in Paragraph 2(A) above, the Defendant has already agreed to compensate members of the class in *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability*

14

*Litigation*, No. 3:15-md-2672 (N.D. Cal.), which consists of individuals who purchased affected vehicles described in Exhibit 2.

### 4.    Other Charges

In exchange for the guilty plea of the Defendant and the complete fulfillment of all of its obligations under this Agreement, the Offices agree that they will not file additional criminal charges against the Defendant or any of its direct or indirect affiliates or subsidiaries related to: (1) any conduct described in the Third Superseding Information or Exhibit 2; (2) any conduct related to the emissions, or compliance with U.S. emissions standards, of the Subject Vehicles or the Porsche Vehicles as described and defined in the Third Superseding Information and Exhibit 2; and (3) any conduct disclosed by, or on behalf of, the Defendant or otherwise known to the Offices or the EPA as of the date of this Agreement. The Offices, however, may use any information related to the conduct described in the Statement of Facts against the Defendant: (a) in a prosecution for perjury or obstruction of justice apart from the charge in the Third Superseding Information and identified in the Statement of Facts; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code. This Paragraph does not provide any protection against prosecution for any other conduct, including but not limited

to crimes committed in the future by the Defendant or by any of its affiliates,
subsidiaries, officers, directors, employees, agents or consultants, whether or not
disclosed by the Defendant pursuant to the terms of this Agreement.  In addition,
this Agreement does not provide any protection against prosecution of any joint
ventures of which the Defendant is a part, or any individuals, regardless of their
affiliation with the Defendant.  The Defendant agrees that nothing in this
Agreement is intended to release the Defendant from any and all of the
Defendant's excise and income tax liabilities and reporting obligations for any and
all income not properly reported and/or legally or illegally obtained or derived.

5.     **The Defendant's Obligations**

       A.     Except as otherwise provided in Paragraph 6 below in connection with
the Defendant's cooperation obligations, the Defendant's obligations under the
Agreement shall last and be effective for a period beginning on the date on which
the Third Superseding Information is filed and ending three years from the later of
the date on which the Third Superseding Information is filed or the date on which
the Monitor is retained by the Defendant, as described in Paragraph 15 below (the
"Term").  The Defendant agrees, however, that, in the event the Offices determine,
in their sole discretion, that the Defendant has failed specifically to perform or to
fulfill each of the Defendant's obligations under this Agreement, an extension or
extensions of the Term may be imposed by the Offices, in their sole discretion, for

up to a total additional time period of one year, without prejudice to the Offices'
right to proceed as provided in Paragraph 9 below. Any extension of the Term
extends all terms of this Agreement, including the terms of the Monitorship in
Exhibit 3, for an equivalent period. Conversely, in the event the Offices find, in their
sole discretion, that there exists a change in circumstances sufficient to eliminate the
need for the Monitorship in Exhibit 3, and that the other provisions of this
Agreement have been satisfied, the Term may be terminated early, except for the
Defendant's cooperation obligations described in Paragraph 6 below.

   B. The Defendant agrees to abide by all terms and obligations of this
Agreement as described herein, including, but not limited to, the following:

     1. to plead guilty as set forth in this Agreement;

     2. to abide by all sentencing stipulations contained in this
Agreement;

     3. to appear, through its duly appointed representatives, as ordered
for all court appearances, and obey any other ongoing court order in this matter,
consistent with all applicable U.S. and foreign laws, procedures, and regulations;

     4. to commit no further crimes;

     5. to be truthful at all times with the Court and the Offices;

     6. to pay the applicable fine and special assessments;

17

7.    to cooperate with and report to the Offices as provided in Paragraph 6; and

8.    to continue to implement a compliance and ethics program designed to prevent and detect fraudulent conduct throughout its operations.

C.    The Defendant agrees that any fine or restitution imposed by the Court will be due and payable in full within ten days of the entry of judgment following the sentencing hearing, and the Defendant will not attempt to avoid or delay payment. The Defendant further agrees to pay the Clerk of the Court for the United States District Court for the Eastern District of Michigan the mandatory special assessment of $400 per count within ten business days from the date of sentencing.

6.    **The Defendant's Cooperation and Reporting Obligations**

A.    The Defendant shall cooperate fully with the Offices in any and all matters relating to the conduct described in this Agreement and Exhibit 2, and other related conduct under investigation by the Offices during the Term, subject to applicable law and regulations, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term. At the request of the Offices, the Defendant shall also cooperate fully with other domestic law enforcement and regulatory authorities and agencies in any investigation of the Defendant, its parent company or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other

18

party, in any and all matters relating to the conduct described in this Agreement and Exhibit 2, and other conduct related to the Defendant's installation of defeat devices and false and fraudulent representations pertaining thereto. The Defendant agrees that its cooperation pursuant to this Paragraph shall include, but not be limited to, the following:

1.     The Defendant shall truthfully disclose all factual information not protected by a valid claim of attorney-client privilege or attorney work product doctrine, or by applicable law and regulations, including applicable data protection laws, with respect to its activities, those of its parent company and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Defendant has any knowledge or about which the Offices may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Defendant to provide to the Offices, upon request, any document, record or other tangible evidence about which the Offices may inquire of the Defendant.

2.     Upon request of the Offices, the Defendant shall designate knowledgeable employees, agents or attorneys to provide to the Offices the information and materials described in Paragraph 6(A)(1) above on behalf of the Defendant. It is further understood that the Defendant must at all times provide complete, truthful, and accurate information.

3.     The Defendant shall use its best efforts to make available for interviews or testimony, as requested by the Offices, present or former officers, directors, employees, agents and consultants of the Defendant. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Defendant, may have material information regarding the matters under investigation.

4.     With respect to any information, testimony, documents, records or other tangible evidence provided to the Offices pursuant to this Agreement, the Defendant consents to any and all disclosures, subject to applicable law and regulations, including applicable data protection laws, to other governmental authorities in the United States of such materials as the Offices, in their sole discretion, shall deem appropriate.

B.     In addition to the obligations in Paragraph 6(A), during the Term, should the Defendant learn of any evidence or allegation of a violation of U.S. federal law by or on behalf of the Defendant and relating to emissions of its vehicles, false or misleading statements made to public authorities or regulators, fraud or misrepresentations in the sale or marketing of its products, or obstruction of any pending or contemplated U.S. federal, state or local investigation or proceeding, the

20

Defendant shall promptly report such evidence or allegation to the Offices. Thirty days prior to the end of the Term, the Defendant, by the Chief Executive Officer of the Defendant and the Chief Financial Officer of the Defendant, will certify to the Offices that the Defendant has met its disclosure obligations pursuant to this Paragraph.    Each certification will be deemed a material statement and representation by the Defendant to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

7.    **Other Obligations**

A.    The Defendant agrees to retain an independent compliance monitor in accordance with Exhibit 3 of this Agreement.

B.    While the obligation set forth in this Paragraph is not a condition to the term of probation, any failure to comply with the obligation set forth in this Paragraph shall constitute a breach of this Agreement and be subject to the terms set forth in Paragraph 9 below.

8.    **Waiver of Appellate and Other Rights Under United States Law**

A.    The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as provided in this Agreement. The Defendant understands that the rights of criminal defendants in the United States include the following:

21

1.      the right to plead not guilty and to persist in that plea;

2.      the right to a jury trial;

3.      the right to be represented by counsel – and if necessary have the court appoint counsel – at trial and at every other stage of the proceedings;

4.      the right at trial to confront and cross-examine adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses; and

5.      pursuant to Title 18, United States Code, Section 3742, the right to appeal the sentence imposed.

B.      Nonetheless, the Defendant knowingly waives the right to appeal the conviction and any sentence within the statutory maximum described above (or the manner in which that sentence was determined) on the grounds set forth in Title 18, United States Code, Section 3742, or on any ground whatsoever except those specifically excluded in this Paragraph, in exchange for the concessions made by the United States in this plea agreement.  This Agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(b).  The Defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of

Information Act, Title 5, United States Code, Section 552, or the Privacy Act, Title 5, United States Code, Section 552a. The Defendant waives all defenses based on the statute of limitations and venue with respect to any federal prosecution related to the conduct described in Exhibit 2 or the Third Superseding Information, including any prosecution that is not time-barred on the date that this Agreement is signed in the event that: (a) the conviction is later vacated for any reason; (b) the Defendant violates this Agreement; or (c) the plea is later withdrawn, provided such prosecution is brought within one year of any such vacation of conviction, violation of agreement, or withdrawal of plea plus the remaining time period of the statute of limitations as of the date that this Agreement is signed. The Offices are free to take any position on appeal or any other post-judgment matter. The parties agree that any challenge to the Defendant's sentence that is not foreclosed by this Paragraph will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) this waiver. Nothing in the foregoing waiver of appellate rights shall preclude the Defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

C.    Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 limit the admissibility of statements made in the course of plea proceedings or plea discussions in both civil and criminal proceedings, if the guilty plea is later withdrawn. The Defendant expressly warrants that it has discussed these rules with

its counsel and understands them.  Solely to the extent set forth below, the Defendant voluntarily waives and gives up the rights enumerated in Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410.  Specifically, the Defendant understands and agrees that any statements that it makes in the course of its guilty plea or in connection with the Agreement, including the Statement of Facts set forth as Exhibit 2 to the Agreement, are admissible against it for any purpose in any U.S. federal criminal proceeding if, even though the Offices have fulfilled all of their obligations under this Agreement and the Court has imposed the agreed-upon sentence, the Defendant nevertheless withdraws its guilty plea.

9.      **Breach of Agreement**

        A.      If the Defendant (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information; (c) fails to cooperate as set forth in Paragraph 6 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraph 3(A)(7) of this Agreement; or (e) otherwise fails specifically to perform or to fulfill each of the Defendant's obligations under the Agreement, regardless of whether the Offices become aware of such a breach after the Term of the Agreement, the Defendant shall thereafter be subject to prosecution for any federal criminal violation of which the Offices have knowledge, including, but not limited to, the charges in the Third Superseding Information described in Paragraph 1, which may

be pursued by the Offices in the United States District Court for the Eastern District of Michigan or any other appropriate venue. Determination of whether the Defendant has breached the Agreement and whether to pursue prosecution of the Defendant shall be in the Offices' sole discretion. Any such prosecution may be premised on information provided by the Defendant. Any such prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Offices prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Defendant, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term of the Agreement plus one year. Thus, by signing this Agreement, the Defendant agrees that the statute of limitations with respect to any such prosecution that is not time- barred on the date of the signing of this Agreement shall be tolled for the Term of the Agreement plus one year. The Defendant gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such prosecution or action, except to the extent that such defenses existed as of the date of the signing of this Agreement. In addition, the Defendant agrees that the statute of limitations as to any violation of federal law that occurs during the term of the cooperation obligations provided for in Paragraph 6 of the Agreement will be tolled from the date upon which the

25

violation occurs until the earlier of the date upon which the Offices are made aware of the violation or the duration of the term plus three years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

B.     In the event the Offices determine that the Defendant has breached this Agreement, the Offices agree to provide the Defendant with written notice of such breach prior to instituting any prosecution resulting from such breach. Within thirty (30) days of receipt of such notice, the Defendant shall have the opportunity to respond to the Offices in writing to explain the nature and circumstances of such breach, as well as the actions the Defendant has taken to address and remediate the situation, which explanation the Offices shall consider in determining whether to pursue prosecution of the Defendant.

C.     In the event that the Offices determine that the Defendant has breached this Agreement:  (a) all statements made by or on behalf of the Defendant to the Offices or to the Court, including the attached Statement of Facts, and any testimony given by the Defendant before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Offices against the Defendant; and (b) the Defendant shall not assert any claim under the United States Constitution,

Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules

of Evidence, or any other federal rule that any such statements or testimony made

by or on behalf of the Defendant prior or subsequent to this Agreement, or any leads

derived therefrom, should be suppressed or are otherwise inadmissible. The decision

whether conduct or statements of any current director, officer or employee, or any

person acting on behalf of, or at the direction of, the Defendant, will be imputed to

the Defendant for the purpose of determining whether the Defendant has violated

any provision of this Agreement shall be in the sole discretion of the Offices.

D.     The Defendant acknowledges that the Offices have made no

representations, assurances, or promises concerning what sentence may be imposed

by the Court if the Defendant breaches this Agreement and this matter proceeds to

judgment.  The Defendant further acknowledges that any such sentence is solely

within the discretion of the Court and that nothing in this Agreement binds or

restricts the Court in the exercise of such discretion.

10.    **Parties to Plea Agreement**

The Defendant understands and agrees that this Agreement is between the

Offices and the Defendant.  Nevertheless, the Offices will bring this Agreement and

the nature and quality of the conduct, cooperation and remediation of the Defendant,

its direct or indirect affiliates and subsidiaries to the attention of other prosecuting

authorities or other agencies, as well as debarment authorities, if requested by the Defendant.

The Defendant agrees that this Agreement will be executed by an authorized corporate representative. The Defendant further agrees that a resolution duly adopted by the Defendant's Management Board, with the consent of the Supervisory Board in the form attached to this Agreement as Exhibit 1, authorizes the Defendant to enter into this Agreement and take all necessary steps to effectuate this Agreement, and that the signatures on this Agreement by the Defendant and its counsel are authorized by the Defendant's Management Board, with the consent of the Supervisory Board, on behalf of the Defendant.

The Defendant agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement.

11.   **Change of Corporate Form**

Except as may otherwise be agreed by the parties in connection with a particular transaction, the Offices may require, in their sole discretion, that, in the event that, during the Term of the Agreement, the Defendant undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Defendant's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in Exhibit 2 (the Statement of Facts), as they exist as of the date of this Agreement, whether such sale

28

is structured as a sale, asset sale, merger, transfer, or other change in corporate form, the Defendant shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. If the Offices so require, the purchaser or successor in interest must also agree in writing that the Offices' ability to declare a breach under this Agreement is applicable in full force to that entity, and the Defendant will agree that the failure to include these provisions in the transaction will make any such transaction null and void. The Defendant shall provide notice to the Offices at least thirty (30) days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Offices will inform the Defendant within such 30-day period if the Offices require the Defendant to take the steps referred to above. If the Offices notify the Defendant prior to such transaction (or series of transactions) that they have determined that the transaction(s) has the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined in the sole discretion of the Offices, the Defendant agrees that such transaction(s) will not be consummated. In addition, if at any time during the Term of the Agreement the Offices determine in their sole discretion that the Defendant has engaged in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, they may deem it a breach of this Agreement pursuant to Paragraph 9 of this Agreement. Nothing herein shall restrict

the Defendant from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Offices.

12.    **Failure of Court to Accept Agreement**

This Agreement is presented to the Court pursuant to Fed. R. Crim. P. 11(c)(1)(C). The Defendant understands that, if the Court rejects this Agreement, the Court must: (a) inform the parties that the Court rejects the Agreement; (b) advise the Defendant's counsel that the Court is not required to follow the Agreement and afford the Defendant the opportunity to withdraw its plea; and (c) advise the Defendant that if the plea is not withdrawn, the Court may dispose of the case less favorably toward the Defendant than the Agreement contemplated. The Defendant further understands that if the Court refuses to accept any provision of this Agreement, neither party shall be bound by the provisions of the Agreement.

13.    **Presentence Report**

The Defendant and the Offices waive the preparation of a Pre-Sentence Investigation Report. The Defendant understands that the decision whether to proceed with the sentencing without a Pre-Sentence Investigation Report is exclusively that of the Court. In the event the Court directs the preparation of a Pre-

30

Sentence Investigation Report, the Offices will fully inform the preparer of the Pre-Sentence Investigation Report and the Court of the facts and law related to the Defendant's case. At the time of the plea hearing, the parties will suggest mutually agreeable and convenient dates for the sentencing.

14.    **Public Statements by the Defendant**

A.    The Defendant expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Defendant make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Defendant set forth above, contradicting the fact that the Defendant has pled guilty to the charges set forth in the Third Superseding Information, or contradicting the facts described in Exhibit 2. Any such contradictory statement shall, subject to cure rights of the Defendant described below, constitute a breach of this Agreement, and the Defendant thereafter shall be subject to prosecution as set forth in Paragraph 9 of this Agreement. The decision whether any such contradictory statement will be imputed to the Defendant for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Offices. If the Offices determine that a public statement by any such person contradicts in whole or in part the fact that the Defendant pled guilty to the charges in the Third Superseding Information or a statement contained in Exhibit 2, the Offices shall so notify the Defendant, and

31

the Defendant may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification. The Defendant shall be permitted to raise defenses, to take legal positions and to assert affirmative claims in other proceedings relating to the matters set forth in the Third Superseding Information and Exhibit 2 provided that such defenses and claims do not contradict, in whole or in part, the fact that the Defendant pled guilty to the charges in the Third Superseding Information or a statement in Exhibit 2. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Defendant in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Defendant.

B.      The Defendant agrees that if it or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, the Defendant shall first consult the Offices to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Offices and the Defendant; and (b) whether the Offices have any objection to the release or statement.

32

15.  **Independent Compliance Monitor**

A.      Promptly after the Offices' selection pursuant to Paragraph 15(B)
below, the Defendant agrees to retain the Monitor for the term specified in
Paragraph 15(C).  The Monitor's duties and authority, and the obligations of the
Defendant with respect to the Monitor and the Offices, are set forth in Exhibit 3,
which is incorporated by reference into this Agreement.  The same Monitor shall
serve as the Independent Auditor appointed pursuant to Paragraph 27(b) of the Third
Partial Consent Decree in *In re: Volkswagen "Clean Diesel" Marketing, Sales
Practices, and Products Liability Litigation*, MDL No. 2672 CRB (JSC) (N.D. Cal.).
No later than the date of execution of this Agreement, and after consultation with
the Offices, the Defendant will propose to the Offices a pool of three qualified
candidates to serve as the Monitor.  If the Offices determine, in their sole discretion,
that any of the candidates are not, in fact, qualified to serve as the Monitor, or if the
Offices, in their sole discretion, are not satisfied with the candidates proposed, the
Offices reserve the right to seek additional nominations from the Defendant.  The
parties will endeavor to complete the monitor selection process within sixty
(60) days of the execution of this Agreement.  The Monitor candidates or their team
members shall have, at a minimum, the following qualifications:

1.      demonstrated expertise with respect to federal anti-fraud and
environmental laws, including experience counseling on these issues;

2.      experience designing and/or reviewing corporate ethics and compliance programs, including anti-fraud policies, procedures and internal controls;

3.      knowledge of automotive or similar industries;

4.      the ability to access and deploy resources as necessary to discharge the Monitor's duties as described in the Agreement;

5.      sufficient independence from the Defendant to ensure effective and impartial performance of the Monitor's duties as described in the Agreement; and

6.      the qualifications set out in Paragraph 27(a) of the Third Partial Consent Decree in *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, MDL No. 2672 CRB (JSC) (N.D. Cal.).

B.      The Offices retain the right, in their sole discretion, to choose the Monitor from among the candidates proposed by the Defendant, though the Defendant may express its preference(s) among the candidates.  In the event the Offices reject all proposed Monitors, the Defendant shall propose an additional three candidates within twenty (20) business days after receiving notice of the rejection. This process shall continue until a Monitor acceptable to both parties is chosen.  The Offices and the Defendant will use their best efforts to complete the selection process within sixty (60) calendar days of the execution of this Agreement.  If, during the

term of the monitorship, the Monitor becomes unable to perform his or her obligations as set out herein and in Exhibit 3, or if the Offices in their sole discretion determine that the Monitor cannot fulfill such obligations to the satisfaction of the Offices, the Offices shall notify the Defendant of the release of the Monitor, and the Defendant shall within thirty (30) calendar days of such notice recommend a pool of three qualified Monitor candidates from which the Offices will choose a replacement.

C.     The Monitor's term shall be three years from the date on which the Monitor is retained by the Defendant, subject to extension or early termination as described in Paragraph 5. The Monitor's powers, duties, and responsibilities, as well as additional circumstances that may support an extension of the Monitor's term, are set forth in Exhibit 3. The Defendant agrees that it will not employ or be affiliated with the Monitor or the Monitor's firm for a period of not less than two years from the date on which the Monitor's term expires. Nor will the Defendant discuss with the Monitor or the Monitor's firm the possibility of further employment or affiliation during the Monitor's term.

16.   **Complete Agreement**

This document states the full extent of the Agreement between the parties. There are no other promises or agreements, express or implied. Any modification of this Agreement shall be valid only if set forth in writing in a supplemental or revised plea agreement signed by all parties.

35

AGREED:

**FOR VOLKSWAGEN AG:**

Date: ___January 11, 2017___

By: _____

Manfred Doess
General Counsel of Volkswagen AG

Date: ___January 11, 2017___

By: _____

Reid Weingarten
Jason Weinstein
Christopher Niewoehner
Steptoe & Johnson LLP
Outside counsel for Volkswagen AG

Date: ___11 January 2017___

By: _____

Aaron R. Marcu
Olivia A. Radin
Linda Martin
Freshfields Bruckhaus Deringer US
    LLP
Outside counsel for Volkswagen AG

Date: ___January 11, 2017___

By: _____

Robert J. Giuffra, Jr.
Sharon L. Nelles
Brent J. McIntosh
Sullivan & Cromwell LLP
Outside counsel for Volkswagen AG

36

**FOR THE DEPARTMENT OF JUSTICE:**

ANDREW WEISSMANN
Chief, Fraud Section
Criminal Division

Date: 1/11/17

By:

Benjamin D. Singer
Chief, Securities and Financial Fraud
Unit
Gary A. Winters
Alison Anderson
David Fuhr
Trial Attorneys

JOHN CRUDEN
Assistant Attorney General
Environment and Natural Resources
Division

Date: 1/11/17

By:

Jennifer L. Blackwell
Trial Attorney

BARBARA L. McQUADE
United States Attorney Eastern District
of Michigan

Date: 1/11/17

By:

John K. Neal
Chief, White Collar Crime Unit

37

**EXHIBIT 1**

**<u>CERTIFICATE OF CORPORATE RESOLUTIONS</u>**

A copy of the executed Certificate of Corporate Resolutions is annexed hereto

as "Exhibit 1."

COMPANY OFFICER'S CERTIFICATE

I have read the plea agreement between Volkswagen AG (the "Defendant") and the United States of America, by and through the Department of Justice, Criminal Division, Fraud Section, the United States Attorney's Office for the Eastern District of Michigan, and the Department of Justice, Environment and Natural Resources Division, Environmental Crimes Section (the "Agreement") and carefully reviewed every part of it with outside counsel for the Defendant. I understand the terms of the Agreement and voluntarily agree, on behalf of the Defendant, to each of its terms. Before signing the Agreement, I consulted outside counsel for the Defendant. Counsel fully advised me of the rights of the Defendant, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of the Agreement with the Management Board and the Supervisory Board. I have advised and caused outside counsel for the Defendant to advise the Management Board and the Supervisory Board fully of the rights of the Defendant, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in the Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing the Agreement on behalf of the Defendant, in any

Exh. 1-2

way to enter into the Agreement.  I am also satisfied with outside counsel's representation in this matter.  I certify that I am the General Counsel for the Defendant and that I have been duly authorized by the Defendant to execute the Agreement on behalf of the Defendant.

Date:  _January 11, 2017_

VOLKSWAGEN AG

By: _____

Manfred Doess
General Counsel

Exh. 1-3

CERTIFICATE OF COUNSEL

I am counsel for Volkswagen AG (the "Defendant") in the matter covered by the plea agreement between the Defendant and the United States of America, by and through the Department of Justice, Criminal Division, Fraud Section, the United States Attorney's Office for the Eastern District of Michigan, and the Department of Justice, Environment and Natural Resources Division, Environmental Crimes Section (the "Agreement"). In connection with such representation, I have examined relevant documents and have discussed the terms of the Agreement with the Management Board and the Supervisory Board. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Defendant has been duly authorized to enter into the Agreement on behalf of the Defendant and that the Agreement has been duly and validly authorized, executed, and delivered on behalf of the Defendant and is a valid and binding obligation of the Defendant. Further, I have carefully reviewed the terms of the Agreement with the Management Board and the Supervisory Board and the officers of the Defendant. I have fully advised them of the rights of the Defendant, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into the Agreement. To my knowledge, the decision of the Defendant to enter into the Agreement, based on the authorization of the Management Board, with the consent of the Supervisory Board, is an informed and voluntary one.

Exh. 1-4

Date: January 11, 2017

By: _____
    Reid Weingarten
    Jason Weinstein
    Christopher Niewoehner
    Steptoe & Johnson LLP
    Counsel to Volkswagen AG


Date: 11 January 2017

By: _____
    Aaron R. Marcu
    Olivia A. Radin
    Linda Martin
    Freshfields Bruckhaus Deringer
        US LLP
    Counsel to Volkswagen AG


Date: January 11, 2017

By: _____
    Robert J. Giuffra, Jr.
    Sharon L. Nelles
    Brent J. McIntosh
    Sullivan & Cromwell LLP
    Counsel for Volkswagen AG


Exh. 1-5

## EXHIBIT 2

## STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the Plea Agreement (the "Agreement") between the United States Department of Justice (the "Department") and Volkswagen AG ("VW AG"). VW AG hereby agrees and stipulates that the following information is true and accurate. VW AG admits, accepts, and acknowledges that under U.S. law it is responsible for the acts of its employees set forth in this Statement of Facts, which acts VW AG acknowledges were within the scope of the employees' employment and, at least in part, for the benefit of VW AG. All references to legal terms and emissions standards, to the extent contained herein, should be understood to refer exclusively to applicable U.S. laws and regulations, and such legal terms contained in this Statement of Facts are not intended to apply to, or affect, VW AG's rights or obligations under the laws or regulations of any jurisdiction outside the United States. This Statement of Facts does not contain all of the facts known to the Department or VW AG; the Department's investigation into individuals is ongoing. The following facts took place during the time frame specified in the Third Superseding Information and establish beyond a reasonable doubt the charges set forth in the criminal Information attached to this Agreement:

Exh. 2-1

**Relevant Entities and Individuals**

1.     VW AG was a motor vehicle manufacturer based in Wolfsburg, Germany.  Under U.S. law, VW AG acts through its employees, and conduct undertaken by VW AG, as described herein, reflects conduct undertaken by employees.  Pursuant to applicable German stock corporation law, VW AG was led by a Management Board that was supervised by a Supervisory Board.  Solely for purposes of this Statement of Facts, unless otherwise indicated, references in this Statement of Facts to "supervisors" are to senior employees below the level of the VW AG Management Board.

2.     Audi AG ("Audi") was a motor vehicle manufacturer based in Ingolstadt, Germany and a subsidiary approximately 99.55% owned by VW AG. Under U.S. law, Audi AG acts through its employees, and conduct undertaken by Audi AG, as described herein, reflects conduct undertaken by employees.

3.     Volkswagen Group of America, Inc. ("VW GOA") was a wholly-owned subsidiary of VW AG based in Herndon, Virginia.  Under U.S. law, VW GOA acts through its employees, and conduct undertaken by VW GOA, as described herein, reflects conduct undertaken by employees.

4.     VW AG, Audi AG, and VW GOA are collectively referred to herein as "VW."

5.   "VW Brand" was an operational unit within VW AG that developed vehicles to be sold under the "Volkswagen" brand name.

6.   Company A was an automotive engineering company based in Berlin, Germany, which specialized in software, electronics, and technology support for vehicle manufacturers.  VW AG owned fifty percent of Company A's shares and was Company A's largest customer.

7.   "Supervisor A," an individual whose identity is known to the United States and VW AG, was the supervisor in charge of Engine Development for all of VW AG from in or about October 2012 to in or about September 2015.  From July 2013 to September 2015, Supervisor A also served as the supervisor in charge of Development for VW Brand, where he supervised a group of approximately 10,000 VW AG employees.  From in or about October 2011, when he joined VW, until in or about July 2013, Supervisor A served as the supervisor in charge of the VW Brand Engine Development department.

8.   "Supervisor B," an individual whose identity is known to the United States and VW AG, was a supervisor in charge of the VW Brand Engine Development department from in or about May 2005 to in or about April 2007.

9.   "Supervisor C," an individual whose identity is known to the United States and VW AG, was a supervisor in charge of the VW Brand Engine Development department from in or about May 2007 to in or about March 2011.

10. "Supervisor D," an individual whose identity is known to the United States and VW AG, was a supervisor in charge of the VW Brand Engine Development department from in or about October 2013 to the present.

11. "Supervisor E," an individual whose identity is known to the United States and VW AG, was a supervisor with responsibility for VW AG's Quality Management and Product Safety department who reported to the supervisor in charge of Quality Management from in or about 2007 to in or about October 2014.

12. "Supervisor F," an individual whose identity is known to the United States and VW AG, was a supervisor within the VW Brand Engine Development department from in or about 2003 until in or about December 2012.

13. "Attorney A," an individual whose identity is known to the United States and VW AG, was a German-qualified in-house attorney for VW AG who was the in-house attorney principally responsible for providing legal advice in connection with VW AG's response to U.S. emissions issues from in or about May 2015 to in or about September 2015.

## U.S. NOx Emissions Standards

14. The purpose of the Clean Air Act and its implementing regulations was to protect human health and the environment by, among other things, reducing emissions of pollutants from new motor vehicles, including nitrogen oxides ("NOx").

15. The Clean Air Act required the U.S. Environmental Protection Agency ("EPA") to promulgate emissions standards for new motor vehicles. The EPA established standards and test procedures for light-duty motor vehicles sold in the United States, including emission standards for NOx.

16. The Clean Air Act prohibited manufacturers of new motor vehicles from selling, offering for sale, introducing or delivering for introduction into U.S. commerce, or importing (or causing the foregoing with respect to) any new motor vehicle unless the vehicle complied with U.S. emissions standards, including NOx emissions standards, and was issued an EPA certificate of conformity.

17. To obtain a certificate of conformity, a manufacturer was required to submit an application to the EPA for each model year and for each test group of vehicles that it intended to sell in the United States. The application was required to be in writing, to be signed by an authorized representative of the manufacturer, and to include, among other things, the results of testing done pursuant to the published Federal Test Procedures that measure NOx emissions, and a description

Exh. 2-5

of the engine, emissions control system, and fuel system components, including a detailed description of each Auxiliary Emission Control Device ("AECD") to be installed on the vehicle.

18.  An AECD was defined under U.S. law as "any element of design which senses temperature, vehicle speed, engine RPM, transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system." The manufacturer was also required to include a justification for each AECD.  If the EPA, in reviewing the application for a certificate of conformity, determined that the AECD "reduced the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use," and that (1) it was not substantially included in the Federal Test Procedure, (2) the need for the AECD was not justified for protection of the vehicle against damage or accident, or (3) it went beyond the requirements of engine starting, the AECD was considered a "defeat device."  Whenever the term "defeat device" is used in this Statement of Facts, it refers to a defeat device as defined by U.S. law.

19.  The EPA would not certify motor vehicles equipped with defeat devices.  Manufacturers could not sell motor vehicles in the United States without a certificate of conformity from the EPA.

20.   The California Air Resources Board ("CARB") (together with the EPA, "U.S. regulators") issued its own certificates, called executive orders, for the sale of motor vehicles in the State of California.  To obtain such a certificate, the manufacturer was required to satisfy the standards set forth by the State of California, which were equal to or more stringent than those of the EPA.

21.   As part of the application for a certification process, manufacturers often worked in parallel with the EPA and CARB.  To obtain a certificate of conformity from the EPA, manufacturers were required to demonstrate that the light-duty vehicles were equipped with an on-board diagnostic ("OBD") system capable of monitoring all emissions-related systems or components. Manufacturers could demonstrate compliance with California OBD standards in order to meet federal requirements.  CARB reviewed applications from manufacturers, including VW, to determine whether their OBD systems were in compliance with California OBD standards, and CARB's conclusion would be included in the application the manufacturer submitted to the EPA.

22.   In 1998, the United States established new federal emissions standards that would be implemented in separate steps, or Tiers.  Tier II emissions standards, including for NOx emissions, were significantly stricter than Tier I.  For light-duty vehicles, the regulations required manufacturers to begin to phase in compliance with the new, stricter Tier II NOx emissions standards in 2004 and required

manufacturers to fully comply with the stricter standards for model year 2007. These strict U.S. NOx emissions standards were applicable specifically to vehicles in the United States.

## VW Diesel Vehicles Sold in the United States

23.  In the United States, VW sold, offered for sale, introduced into commerce, delivered for introduction into commerce, imported, or caused the foregoing actions (collectively, "sold in the United States") the following vehicles containing 2.0 liter diesel engines ("2.0 Liter Subject Vehicles"):

    a.    Model Year ("MY") 2009-2015 VW Jetta;

    b.    MY 2009-2014 VW Jetta Sportwagen;

    c.    MY 2010-2015 VW Golf;

    d.    MY 2015 VW Golf Sportwagen;

    e.    MY 2010-2013, 2015 Audi A3;

    f.    MY 2013-2015 VW Beetle and VW Beetle Convertible; and

    g.    MY 2012-2015 VW Passat.

24.  VW sold in the United States the following vehicles containing 3.0 liter diesel engines ("3.0 Liter Subject Vehicles"):

    a.    MY 2009-2016 VW Touareg;

    b.    MY 2009-2015 Audi Q7;

    c.    MY 2014-2016 Audi A6 Quattro;

Exh. 2-8

      d.    MY 2014-2016 Audi A7 Quattro;

      e.    MY 2014-2016 Audi A8L; and

      f.    MY 2014-2016 Audi Q5.

25.    VW GOA's Engineering and Environmental Office ("EEO") was located in Auburn Hills, Michigan, in the Eastern District of Michigan. Among other things, EEO prepared and submitted applications (the "Applications") for a certificate of conformity and an executive order (collectively, "Certificates") to the EPA and CARB to obtain authorization to sell each of the 2.0 Liter Subject Vehicles and 3.0 Liter Subject Vehicles in the United States (collectively, the "Subject Vehicles"). VW GOA's Test Center California performed testing related to the Subject Vehicles.

26.    VW AG developed the engines for the 2.0 Liter Subject Vehicles. Audi AG developed the engines for the 3.0 Liter Subject Vehicles and the MY 2013-2016 Porsche Cayenne diesel vehicles sold in the United States (the "Porsche Vehicles").

27.    The Applications to the EPA were accompanied by the following signed statement by a VW representative:

> The Volkswagen Group states that any element of design, system, or emission control device installed on or incorporated in the Volkswagen Group's new motor vehicles or new motor vehicle engines for the purpose of complying with standards prescribed under section 202 of the Clean Air Act, will not, to the best of the Volkswagen Group's information and belief,

Exh. 2-9

cause the emission into the ambient air of pollutants in the
operation of its motor vehicles or motor vehicle engines which
cause or contribute to an unreasonable risk to public health or
welfare except as specifically permitted by the standards
prescribed under section 202 of the Clean Air Act. The
Volkswagen Group further states that any element of design,
system, or emission control device installed or incorporated in
the Volkswagen Group's new motor vehicles or new motor
vehicle engines, for the purpose of complying with standards
prescribed under section 202 of the Clean Air Act, will not, to
the best of the Volkswagen Group's information and belief,
cause or contribute to an unreasonable risk to public safety.

. . .

All vehicles have been tested in accordance with good
engineering practice to ascertain that such test vehicles meet the
requirement of this section for the useful life of the vehicle.

28.     Based on the representations made by VW employees in the

Applications for the Subject Vehicles, EPA and CARB issued Certificates for these

vehicles, allowing the Subject Vehicles to be sold in the United States.

29.     Upon importing the Subject Vehicles into the United States, VW

disclosed to U.S. Customs and Border Protection ("CBP") that the vehicles were

covered by valid Certificates by affixing an emissions label to the vehicles'

engines. These labels stated that the vehicles conformed to EPA and CARB

emissions regulations. VW affixed these labels to each of the Subject Vehicles that

it imported into the United States.

30.     VW represented to its U.S. customers, U.S. dealers, U.S. regulators

and others in the United States that the Subject Vehicles met the new and stricter

Exh. 2-10

U.S. emissions standards identified in paragraph 22 above. Further, VW designed a specific marketing campaign to market these vehicles to U.S. customers as "clean diesel" vehicles.

### VW AG's Criminal Conduct

31.  From approximately May 2006 to approximately November 2015, VW AG, through Supervisors A-F and other VW employees, agreed to deceive U.S. regulators and U.S. customers about whether the Subject Vehicles and the Porsche Vehicles complied with U.S. emissions standards. During their involvement with design, marketing and/or sale of the Subject Vehicles and the Porsche Vehicles in the United States, Supervisors A-F and other VW employees: (a) knew that the Subject Vehicles and the Porsche Vehicles did not meet U.S. emissions standards; (b) knew that VW was using software to cheat the U.S. testing process by making it appear as if the Subject Vehicles and the Porsche Vehicles met U.S. emissions standards when, in fact, they did not; and (c) attempted to and did conceal these facts from U.S. regulators and U.S. customers.

#### The 2.0 Liter Defeat Device in the United States

32.  In at least in or about 2006, VW AG employees working under the supervision of Supervisors B, C, and F were designing the new EA 189 2.0 liter diesel engine (later known as the Generation 1 or "Gen 1") for use in the United States that would be the cornerstone of a new project to sell passenger diesel

Exh. 2-11

vehicles in the United States. Selling diesel vehicles in the U.S. market was an important strategic goal of VW AG. This project became known within VW as the "US'07" project.

33. Supervisors B, C, and F, and others, however, realized that VW could not design a diesel engine that would both meet the stricter U.S. NOx emissions standards that would become effective in 2007 and attract sufficient customer demand in the U.S. market. Instead of bringing to market a diesel vehicle that could legitimately meet the new, more restrictive U.S. NOx emissions standards, VW AG employees acting at the direction of Supervisors B, C, and F and others, including Company A employees, designed, created, and implemented a software function to detect, evade and defeat U.S. emissions standards.

34. While employees acting at their direction designed and implemented the defeat device software, Supervisors B, C, and F, and others knew that U.S. regulators would measure VW's diesel vehicles' emissions through standard U.S. tests with specific, published drive cycles. VW AG employees acting at the direction of Supervisors B, C, and F, and others designed the VW defeat device to recognize whether the vehicle was undergoing standard U.S. emissions testing on a dynamometer (or "dyno") or whether the vehicle was being driven on the road under normal driving conditions. The defeat device accomplished this by recognizing the standard drive cycles used by U.S. regulators. If the vehicle's

software detected that it was being tested, the vehicle performed in one mode, which satisfied U.S. NOx emissions standards. If the defeat device detected that the vehicle was not being tested, it operated in a different mode, in which the effectiveness of the vehicle's emissions control systems was reduced substantially, causing the vehicle to emit substantially higher NOx, sometimes 35 times higher than U.S. standards.

35. In designing the defeat device, VW engineers borrowed the original concept of the dual-mode, emissions cycle-beating software from Audi. On or about May 17, 2006, a VW engineer, in describing the Audi software, sent an email to employees in the VW Brand Engine Development department that described aspects of the software and cautioned against using it in its current form because it was "pure" cycle-beating, i.e., as a mechanism to detect, evade and defeat U.S. emissions cycles or tests. The VW AG engineer wrote (in German), "within the clearance structure of the pre-fuel injection the acoustic function is nearly always activated within our current US'07-data set. This function is pure [cycle-beating] and can like this absolutely not be used for US'07."

36. Throughout in or around 2006, Supervisor F authorized VW AG engineers to use the defeat device in the development of the US'07 project, despite concerns expressed by certain VW AG employees about the propriety of designing and activating the defeat device software. In or about the fall of 2006, lower level

VW AG engineers, with the support of their supervisors, raised objections to the propriety of the defeat device, and elevated the issue to Supervisor B. During a meeting that occurred in or about November 2006, VW AG employees briefed Supervisor B on the purpose and design of the defeat device. During the meeting, Supervisor B decided that VW should continue with production of the US'07 project with the defeat device, and instructed those in attendance, in sum and substance, not to get caught.

37. Throughout 2007, various technical problems arose with the US'07 project that led to internal discussions and disagreements among members of the VW AG team that was primarily responsible for ensuring vehicles met U.S. emissions standards. Those disagreements over the direction of the project were expressly articulated during a contentious meeting on or about October 5, 2007, over which Supervisor C presided. As a result of the meeting, Supervisor C authorized Supervisor F and his team to proceed with the US'07 project despite knowing that only the use of the defeat device software would enable VW diesel vehicles to pass U.S. emissions tests.

38. Starting with the first model year 2009 of VW's new engine for the 2.0 Liter Subject Vehicles through model year 2016, Supervisors A-D and F, and others, then caused the defeat device software to be installed in the 2.0 Liter Subject Vehicles marketed and sold in the United States.

*The 3.0 Liter Defeat Device in the United States*

39.   Starting in or around 2006, Audi AG engineers designed a 3.0 liter diesel for the U.S. market.  The 3.0 liter engine was more powerful than the 2.0 liter engine, and was included in larger and higher-end model vehicles.  The 3.0 liter engine was ultimately placed in various Volkswagen, Audi and Porsche diesel vehicles sold in the United States for model years 2009 through 2016.  In order to pass U.S. emissions tests, Audi engineers designed and installed software designed to detect, evade and defeat U.S. emissions standards, which constituted a defeat device under U.S. law.

40.   Specifically, Audi AG engineers calibrated a defeat device for the 3.0 Liter Subject Vehicles and the Porsche Vehicles that varied injection levels of a solution consisting of urea and water ("AdBlue") into the exhaust gas system based on whether the vehicle was being tested or not, with less NOx reduction occurring during regular driving conditions.  In this way, the vehicle consumed less AdBlue, and avoided a corresponding increase in the vehicle's AdBlue tank size, which would have decreased the vehicle's trunk size, and made the vehicle less marketable in the United States.  In addition, the vehicle could drive further between service intervals, which was also perceived as important to the vehicle's marketability in the United States.

Exh. 2-15

### Certification of VW Diesel Vehicles in the United States

41.  VW employees met with the EPA and CARB to seek the certifications required to sell the Subject Vehicles to U.S. customers.  During these meetings, some of which Supervisor F attended personally, VW employees misrepresented, and caused to be misrepresented, to the EPA and CARB staff that the Subject Vehicles complied with U.S. NOx emissions standards, when they knew the vehicles did not.  During these meetings, VW employees described, and caused to be described, VW's diesel technology and emissions control systems to the EPA and CARB staff in detail but omitted the fact that the engine could not meet U.S. emissions standards without using the defeat device software.

42.  Also as part of the certification process for each new model year, Supervisors A-F and others certified, and/or caused to be certified, to the EPA and CARB that the Subject Vehicles met U.S. emissions standards and complied with standards prescribed by the Clean Air Act.  Supervisors A-F, and others, knew that if they had told the truth and disclosed the existence of the defeat device, VW would not have obtained the requisite Certificates for the Subject Vehicles and could not have sold any of them in the United States.

### *Importation of VW Diesel Vehicles in the United States*

43.   In order to import the Subject Vehicles into the United States, VW was required to disclose to CBP whether the vehicles were covered by valid certificates for the United States. VW did so by affixing a label to the vehicles' engines. VW employees caused to be stated on the labels that the vehicles complied with applicable EPA and CARB emissions regulations and limitations, knowing that if they had disclosed that the Subject Vehicles did not meet U.S. emissions regulations and limitations, VW would not have been able to import the vehicles into the United States. Certain VW employees knew that the labels for the Porsche Vehicles stated that those vehicles complied with EPA and CARB emissions regulations and limitations, when in fact, the VW employees knew they did not.

### *Marketing of "Clean Diesel" Vehicles in the United States*

44.   Supervisors A and C and others marketed, and caused to be marketed, the Subject Vehicles to the U.S. public as "clean diesel" and environmentally-friendly, when they knew the Subject Vehicles were intentionally designed to detect, evade and defeat U.S. emissions standards.

45.   For example, on or about November 18, 2007, Supervisor C sent an email to Supervisor F and others attaching three photos of himself with

California's then-Governor, which were taken during an event at which Supervisor C promoted the 2.0 Liter Subject Vehicles in the United States as "green diesel."

### The Improvement of the 2.0 Liter Defeat Device in the United States

46.  Following the launch of the Gen 1 2.0 Liter Subject Vehicles in the United States, Supervisors C and F, and others, worked on a second generation of the vehicle (the "Gen 2"), which also contained software designed to detect, evade and defeat U.S. emissions tests.  The Gen 2 2.0 Liter Subject Vehicles were launched in the United States in or around 2011.

47.  In or around 2012, hardware failures developed in certain of the 2.0 Liter Subject Vehicles that were being used by customers on the road in the United States. VW AG engineers hypothesized that vehicles equipped with the defeat device stayed in "dyno" mode (i.e., testing mode) even when driven on the road outside of test conditions.  Since the 2.0 Liter Subject Vehicles were not designed to be driven for longer periods of time in "dyno" mode, VW AG engineers suspected that the increased stress on the exhaust system from being driven too long in "dyno" mode could be the root cause of the hardware failures.

48.  In or around July 2012, engineers from the VW Brand Engine Development department met, in separate meetings, with Supervisors A and E to explain that they suspected that the root cause of the hardware failures in the 2.0 Liter Subject Vehicles was the increased stress on the exhaust system from being

Exh. 2-18

driven too long in "dyno" mode as a result of the use of software designed to detect, evade and defeat U.S. emissions tests. To illustrate the software's function, the engineers used a document. Although they understood the purpose and significance of the software, Supervisors A and E each encouraged the further concealment of the software. Specifically, Supervisors A and E each instructed the engineers who presented the issue to them to destroy the document they had used to illustrate the operation of the defeat device software.

49.    VW AG engineers, having informed the supervisor in charge of the VW AG Engine Development department and within the VW AG Quality Management and Product Safety department of the existence and purpose of the defeat device in the 2.0 Liter Subject Vehicles, then sought ways to improve its operation in existing 2.0 Liter Subject Vehicles to avoid the hardware failures. To solve the hardware failures, VW AG engineers decided to start the 2.0 Liter Subject Vehicles in the "street mode" and, when the defeat device recognized that the vehicle was being tested for compliance with U.S. emissions standards, switch to the "dyno mode." To increase the likelihood that the vehicle in fact realized that it was being tested on the dynamometer for compliance with U.S. emissions standards, the VW AG engineers activated a "steering wheel angle recognition" feature. The steering wheel angle recognition interacted with the software by

enabling the vehicle to detect whether it was being tested on a dynamometer (where the steering wheel is not turned), or being driven on the road.

50.   Certain VW AG employees again expressed concern, specifically about the expansion of the defeat device through the steering wheel angle detection, and sought approval for the function from more senior supervisors within the VW AG Engine Development department.  In particular, VW AG engineers asked Supervisor A for a decision on whether or not to use the proposed function in the 2.0 Liter Subject Vehicles.  In or about April 2013, Supervisor A authorized activation of the software underlying the steering wheel angle recognition function.  VW employees then installed the new software function in new 2.0 Liter Subject Vehicles being sold in the United States, and later installed it in existing 2.0 Liter Subject Vehicles through software updates during maintenance.

51.   VW employees falsely told, and caused others to tell, U.S. regulators, U.S. customers and others in the United States that the software update in or around 2014 was intended to improve the 2.0 Liter Subject Vehicles when, in fact, VW employees knew that the update also used the steering wheel angle of the vehicle as a basis to more easily detect when the vehicle was undergoing emissions tests, thereby improving the defeat device's precision in order to reduce the stress on the emissions control systems.

### The Concealment of the Defeat Devices in the United States – 2.0 Liter

52.   In or around March 2014, certain VW employees learned of the results of a study undertaken by West Virginia University's Center for Alternative Fuels, Engines and Emissions and commissioned by the International Council on Clean Transportation (the "ICCT study"). The ICCT study identified substantial discrepancies in the NOx emissions from certain 2.0 Liter Subject Vehicles when tested on the road compared to when these vehicles were undergoing EPA and CARB standard drive cycle tests on a dynamometer. The results of the study showed that two of the three vehicles tested on the road, both 2.0 Liter Subject Vehicles, emitted NOx at values of up to approximately 40 times the permissible limit applicable during testing in the United States.

53.   Following the ICCT study, CARB, in coordination with the EPA, attempted to work with VW to determine the cause for the higher NOx emissions in the 2.0 Liter Subject Vehicles when being driven on the road as opposed to on the dynamometer undergoing standard emissions test cycles. To do this, CARB, in coordination with the EPA, repeatedly asked VW questions that became increasingly more specific and detailed, as well as conducted additional testing themselves.

54.   In response to learning about the results of the ICCT study, engineers in the VW Brand Engine Development department formed an ad hoc task force to

formulate responses to questions that arose from the U.S. regulators. VW AG
supervisors, including Supervisors A, D, and E, and others, determined not to
disclose to U.S. regulators that the tested vehicle models operated with a defeat
device. Instead, Supervisors A, D, and E, and others decided to pursue a strategy
of concealing the defeat device in responding to questions from U.S. regulators,
while appearing to cooperate.

55. Throughout 2014 and the first half of 2015, Supervisors A, D, and E,
and others, continued to offer, and/or cause to be offered, software and hardware
"fixes" and explanations to U.S. regulators for the 2.0 Liter Subject Vehicles'
higher NOx measurements on the road without revealing the underlying reason –
the existence of software designed to detect, evade and defeat U.S. emissions tests.

56. On or about April 28, 2014, members of the VW task force presented
the findings of the ICCT study to Supervisor E, whose supervisory responsibility
included addressing safety and quality problems in vehicles in production.
Included in the presentation was an explanation of the potential financial
consequences VW could face if the defeat device was discovered by U.S.
regulators, including but not limited to applicable fines per vehicle, which were
substantial.

57. On or about May 21, 2014, a VW AG employee sent an email to his
supervisor, Supervisor D, and others, describing an "early round meeting" with

Exh. 2-22

Supervisor A, at which emissions issues in North America for the Gen 2 2.0 Liter Subject Vehicles were discussed, and questions were raised about the risk of what could happen and the available options for VW. Supervisor D responded by email that he was in "direct touch" with the supervisor in charge of Quality Management at VW AG and instructed the VW AG employee to "please treat confidentially" the issue.

58. On or about October 1, 2014, VW AG employees presented to CARB regarding the ICCT study results and discrepancies identified in NOx emissions between dynamometer testing and road driving. In response to questions, the VW AG employees did not reveal that the existence of the defeat device was the explanation for the discrepancies in NOx emissions, and, in fact, gave CARB various false reasons for the discrepancies in NOx emissions including driving patterns and technical issues.

59. When U.S. regulators threatened not to certify VW model year 2016 vehicles for sale in the United States, VW AG supervisors requested a briefing on the situation in the United States. On or about July 27, 2015, VW AG employees presented to VW AG supervisors. Supervisors A and D were present, among others.

60. On or about August 5, 2015, in a meeting in Traverse City, Michigan, two VW employees met with a CARB official to discuss again the discrepancies in

emissions of the 2.0 Liter Subject Vehicles. The VW employees did not reveal the existence of the defeat device.

61. On or about August 18, 2015, Supervisors A and D, and others, approved a script to be followed by VW AG employees during an upcoming meeting with CARB in California on or about August 19, 2015. The script provided for continued concealment of the defeat device from CARB in the 2.0 Liter Subject Vehicles, with the goal of obtaining approval to sell the Gen 3 model year 2016 2.0 Liter Subject Vehicles in the United States.

62. On or about August 19, 2015, in a meeting with CARB in El Monte, California, a VW employee explained, for the first time to U.S. regulators and in direct contravention of instructions from supervisors at VW AG, that certain of the 2.0 Liter Subject Vehicles used different emissions treatment depending on whether the vehicles were on the dynamometer or the road, thereby signaling that VW had evaded U.S. emissions tests.

63. On or about September 3, 2015, in a meeting in El Monte, California with CARB and EPA, Supervisor D, while creating the false impression that he had been unaware of the defeat device previously, admitted that VW had installed a defeat device in the 2.0 Liter Subject Vehicles.

64. On or about September 18, 2015, the EPA issued a public Notice of Violation to VW stating that the EPA had determined that VW had violated the

Clean Air Act by manufacturing and installing defeat devices in the 2.0 Liter Subject Vehicles.

### *The Concealment of the Defeat Devices in the United States – 3.0 Liter*

65.  On or about January 27, 2015, CARB informed VW AG that CARB would not approve certification of the Model Year 2016 3.0 Liter Subject Vehicles until Audi AG confirmed that the 3.0 Liter Subject Vehicles did not possess the same emissions issues as had been identified by the ICCT study and as were being addressed by VW with the 2.0 Liter Subject Vehicles.

66.  On or about March 24, 2015, in response to CARB's questions, Audi AG employees made a presentation to CARB, during which Audi AG employees did not disclose that the Audi 2.0 and 3.0 Liter Subject Vehicles and the Porsche Vehicles in fact contained a defeat device, which caused emissions discrepancies in those vehicles. The Audi AG employees informed CARB that the 3.0 Liter Subject Vehicles did not possess the same emissions issues as the 2.0 Liter Subject Vehicles when, in fact, the 3.0 Liter Subject Vehicles possessed at least one defeat device that interfered with the emissions systems to reduce NOx emissions on the dyno but not on the road. On or about March 25, 2015, CARB, based on the misstatements and omissions made by the Audi AG representatives, issued an executive order approving the sale of Model Year 2016 3.0 Liter Subject Vehicles.

67. On or about November 2, 2015, EPA issued a Notice of Violation to VW AG, Audi AG and Porsche AG, citing violations of the Clean Air Act related to EPA's discovery that the 3.0 Liter Subject Vehicles and the Porsche Vehicles contained a defeat device that resulted in excess NOx emissions when the vehicles were driven on the road.

68. On or about November 2, 2015, VW AG issued a statement that "no software has been installed in the 3-liter V6 diesel power units to alter emissions characteristics in a forbidden manner."

69. On or about November 19, 2015, Audi AG representatives met with EPA and admitted that the 3.0 Liter Subject Vehicles contained at least three undisclosed AECDs. Upon questioning from EPA, Audi AG representatives conceded that one of these three undisclosed AECDs met the criteria of a defeat device under U.S. law.

70. On or about May 16, 2016, Audi AG representatives met with CARB and admitted that there were additional elements within two of its undisclosed AECDs, which impacted the dosing strategy in the 3.0 Liter Subject Vehicles and the Porsche Vehicles.

71. On or about July 19, 2016, in a presentation to CARB, Audi AG representatives conceded that elements of two of its undisclosed AECDs met the definition of a defeat device.

72.   Supervisors A-F and others caused defeat device software to be installed on all of the approximately 585,000 Subject Vehicles and the Porsche Vehicles sold in the United States from 2009 through 2015.

### Obstruction of Justice

73.   As VW employees prepared to admit to U.S. regulators that VW used a "defeat device" in the 2.0 Liter Subject Vehicles, counsel for VW GOA prepared a litigation hold notice to ensure that VW GOA preserved documents relevant to diesel emissions issues. At the same time, VW GOA was in contact with VW AG to discuss VW AG preserving documents relevant to diesel emissions issues. Attorney A made statements that several employees understood as suggesting the destruction of these materials. In anticipation of this hold taking effect at VW AG, certain VW AG employees destroyed documents and files related to U.S. emissions issues that they believed would be covered by the hold. Certain VW AG employees also requested that their counterparts at Company A destroy sensitive documents relating to U.S. emissions issues. Certain Audi AG employees also destroyed documents related to U.S. emissions issues. The VW AG and Audi AG employees who participated in this deletion activity did so to protect both VW and themselves from the legal consequences of their actions.

74. Between the August 19, 2015 and September 3, 2015 meetings with U.S. regulators, certain VW AG employees discussed issues with Attorney A and others.

75. On or about August 26, 2015, VW GOA's legal team sent the text of a litigation hold notice to Attorney A in VW AG's Wolfsburg office that would require recipients to preserve and retain records in their control. The subject of the e-mail was "Legal Hold Notice – Emissions Certification of MY2009-2016 2.0L TDI Volkswagen and Audi vehicles." The VW GOA legal team stated that VW GOA would be issuing the litigation hold notice to certain VW GOA employees the following day. On or about August 28, 2015, Attorney A received notice that VW GOA was issuing that litigation hold notice that day. Attorney A indicated to his staff on August 31 that the hold would be sent out at VW AG on September 1. Among those at VW AG being asked to retain and preserve documents were Supervisors A and D and a number of other VW AG employees.

76. On or about August 27, 2015, Attorney A met with several VW AG engineers to discuss the technology behind the defeat device. Attorney A indicated that a hold was imminent, and that these engineers should check their documents, which multiple participants understood to mean that they should delete documents prior to the hold being issued.

77.  On or about August 31, 2015, a meeting was held to prepare for the September 3 presentation to CARB and EPA where VW's use of the defeat device in the United States was to be formally revealed.  During the meeting, within hearing of several participants, Attorney A discussed the forthcoming hold and again told the engineers that the hold was imminent and recommended that they check what documents they had.  This comment led multiple individuals, including supervisors in the VW Brand Engine Development department at VW AG, to delete documents related to U.S. emissions issues.

78.  On or about September 1, 2015, the hold at VW AG was issued.  On or about September 1, 2015, several employees in the VW Brand Engine Development department at VW AG discussed the fact that their counterparts at Company A would also possess documents related to U.S. emissions issues.  At least two VW AG employees contacted Company A employees and asked them to delete documents relating to U.S. emissions issues.

79.  On or about September 3, 2015, Supervisor A approached Supervisor D's assistant, and requested that Supervisor D's assistant search in Supervisor D's office for a hard drive on which documents were stored containing emails of VW AG supervisors, including Supervisor A.  Supervisor D's assistant recovered the hard drive and gave it to Supervisor A.  Supervisor A later asked his assistant to throw away the hard drive.

80.  On or about September 15, 2015, a supervisor within the VW Brand Engine Development department convened a meeting with approximately 30-40 employees, during which Attorney A informed the VW AG employees present about the current situation regarding disclosure of the defeat device in the United States.  During this meeting, a VW AG employee asked Attorney A what the employees should do with new documents that were created, because they could be harmful to VW AG.  Attorney A indicated that new data should be kept on USB drives and only the final versions saved on VW AG's system, and then, only if "necessary."

81.  Even employees who did not attend these meetings, or meet with Attorney A personally, became aware that there had been a recommendation from a VW AG attorney to delete documents related to U.S. emissions issues.  Within VW AG and Audi AG, thousands of documents were deleted by approximately 40 VW AG and Audi AG employees.

82.  After it began an internal investigation, VW AG was subsequently able to recover many of the deleted documents.

Exh. 2-30

**EXHIBIT 3**

**<u>INDEPENDENT COMPLIANCE MONITOR</u>**

The duties and authority of the Independent Compliance Monitor (the "Monitor"), and the obligations of Volkswagen AG, on behalf of itself and its subsidiaries and affiliates other than Porsche AG and Porsche Cars North America (for purposes of this Exhibit 3, the "Defendant" or "Company"), with respect to the Monitor and the United States Department of Justice, Criminal Division, Fraud Section, the United States Attorney's Office for the Eastern District of Michigan, and the United States Department of Justice, Environment and Natural Resources Division, Environmental Crimes Section (collectively hereafter, "the Offices"), are as described below. For the avoidance of doubt, the Monitorship described herein does not extend to Porsche AG or Porsche Cars North America.

1.      The Company will retain the Monitor for a period of three years (the "Term of the Monitorship"), unless the early termination provision of Paragraph 5(A) of the Plea Agreement (the "Agreement") is triggered.

*Monitor's Mandate*

2.      The Monitor's responsibility is to assess, oversee, and monitor the Company's compliance with the terms of the Agreement, so as to specifically address and reduce the risk of any recurrence of the Company's misconduct, and to oversee the Company's obligations under Section V (Injunctive Relief for VW Defendants) of the Third Partial Consent Decree in *In re: Volkswagen "Clean Diesel"*

Exh. 3-1

*Marketing, Sales Practices, and Products Liability Litigation*, MDL No. 2672 CRB

(JSC) (N.D. Cal.).  During the Term of the Monitorship, the Monitor will evaluate,

in the manner set forth below, the Company's implementation and enforcement of

its compliance and ethics program for the purpose of preventing future criminal

fraud and environmental violations by the Company and its affiliates, including, but

not limited to, violations related to the conduct giving rise to the Third Superseding

Information filed in this matter, and will take such reasonable steps as, in his or her

view, may be necessary to fulfill the foregoing mandate (the "Mandate").  This

Mandate shall include an assessment of the Board of Management's and senior

management's commitment to, and effective implementation of, the Company's

corporate compliance and ethics program.

### Company's Obligations

3.      The Company shall cooperate fully with the Monitor, and the Monitor

shall have the authority to take such reasonable steps as, in his or her view, may be

necessary to be fully informed about the Company's ethics and compliance program

in accordance with the principles set forth herein and applicable law, including

applicable environmental, data protection, and labor laws and regulations.  To that

end, the Company shall:   facilitate the Monitor's access to the Company's

documents and resources; not limit such access, except as provided in Paragraphs 5-

6; and provide guidance on applicable local law (such as relevant data protection and

labor laws).  The Company shall provide the Monitor with access to all information, documents, records, facilities, and employees, as reasonably requested by the Monitor, that fall within the scope of the Mandate of the Monitor under the Agreement.  The Company shall use its best efforts to provide the Monitor with access to the Company's former employees and its third- party vendors, agents, and consultants.

4.     Any disclosure by the Company to the Monitor concerning fraudulent conduct shall not relieve the Company of any otherwise applicable obligation to truthfully disclose such matters to the Offices, pursuant to the Agreement.

*Withholding Access*

5.     The parties agree that no attorney-client relationship shall be formed between the Company and the Monitor.  In the event that the Company seeks to withhold from the Monitor access to information, documents, records, facilities, or current or former employees of the Company that may be subject to a claim of attorney-client privilege or to the attorney work-product doctrine, or where the Company reasonably believes production would otherwise be inconsistent with applicable law, the Company shall work cooperatively with the Monitor to resolve the matter to the satisfaction of the Monitor consistent with applicable law.

6.     If the matter cannot be resolved, at the request of the Monitor, the Company shall promptly provide written notice to the Monitor and the Offices.  Such

notice shall include a general description of the nature of the information, documents, records, facilities or current or former employees that are being withheld, as well as the legal basis for withholding access. The Offices may then consider whether to make a further request for access to such information, documents, records, facilities, or employees.

*Monitor's Coordination with the Company and Review Methodology*

7.    In carrying out the Mandate, to the extent appropriate under the circumstances, the Monitor should coordinate with Company personnel, including in-house counsel, compliance personnel, and internal auditors, on an ongoing basis. The Monitor may rely on the product of the Company's processes, such as the results of studies, reviews, sampling and testing methodologies, audits, and analyses conducted by or on behalf of the Company, as well as the Company's internal resources (e.g., legal, compliance, and internal audit), which can assist the Monitor in carrying out the Mandate through increased efficiency and Company- specific expertise, provided that the Monitor has confidence in the quality of those resources.

8.    The Monitor's reviews should use a risk-based approach, and thus, the Monitor is not expected to conduct a comprehensive review of all business lines, all business activities, or all markets. In carrying out the Mandate, the Monitor should consider, for instance, risks presented by: (a) organizational structure; (b) training programs or lack thereof; (c) compensation structure; (d) internal auditing

processes;   (e) internal   investigation   procedures;   (f) reporting   mechanisms; (g) corporate culture; and (h) employee incentives and disincentives.

9.      In undertaking the reviews to carry out the Mandate, the Monitor shall formulate conclusions based on, among other things:   (a) inspection of relevant documents, including the Company's current anti-fraud and environmental policies and procedures; (b) on-site observation of selected systems and procedures of the Company at sample sites; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons at mutually convenient times and places; and (d) analyses, studies, and testing of the Company's compliance program.

*Monitor's Written Work Plans*

10.      To carry out the Mandate, during the Term of the Monitorship, the Monitor shall conduct an initial review and prepare an initial report, followed by at least two follow-up reviews and reports as described in Paragraphs 16-19 below. With respect to the initial report, after consultation with the Company and the Offices, the Monitor shall prepare the first written work plan within sixty (60) calendar days of being retained, and the Company and the Offices shall provide comments within thirty (30) calendar days after receipt of the written work plan. With respect to each follow-up report, after consultation with the Company and the Offices, the Monitor shall prepare a written work plan at least thirty (30) calendar

Exh. 3-5

days prior to commencing a review, and the Company and the Offices shall provide comments within twenty (20) calendar days after receipt of the written work plan. Any disputes between the Company and the Monitor with respect to any written work plan shall be decided by the Offices in their sole discretion.

11.    All written work plans shall identify with reasonable specificity the activities the Monitor plans to undertake in execution of the Mandate, including a written request for documents. The Monitor's work plan for the initial review shall include such steps as are reasonably necessary to conduct an effective initial review in accordance with the Mandate, including by developing an understanding, to the extent the Monitor deems appropriate, of the facts and circumstances surrounding any violations that may have occurred before the date of the Agreement.   In developing such understanding the Monitor is to rely to the extent possible on available information and documents provided by the Company. It is not intended that the Monitor will conduct his or her own inquiry into the historical events that gave rise to the Agreement.

*Initial Review*

12.    The initial review shall commence no later than one hundred twenty (120) calendar days from the date of the engagement of the Monitor (unless otherwise agreed by the Company, the Monitor, and the Offices). The Monitor shall issue a written report within one hundred fifty (150) calendar days of commencing

the initial review, setting forth the Monitor's assessment and, if necessary, making recommendations reasonably designed to improve the effectiveness of the Company's program for ensuring compliance with anti-fraud and environmental laws. The Monitor should consult with the Company concerning his or her findings and recommendations on an ongoing basis and should consider the Company's comments and input to the extent the Monitor deems appropriate. The Monitor may also choose to share a draft of his or her reports with the Company prior to finalizing them. The Monitor's reports need not recite or describe comprehensively the Company's history or compliance policies, procedures and practices, but rather may focus on those areas with respect to which the Monitor wishes to make recommendations, if any, for improvement or which the Monitor otherwise concludes merit particular attention. The Monitor shall provide the report to the Management Board of the Company and contemporaneously transmit copies to the Deputy Chief – Securities and Financial Fraud Unit, Fraud Section, Criminal Division, U.S. Department of Justice, at 1400 New York Avenue N.W., Bond Building, Washington, D.C. 20005; Chief, White Collar Crime Unit, United States Attorney's Office, Eastern District of Michigan, 211 W. Fort Street, Suite 2001, Detroit, Michigan 48226; and Deputy Chief, Environmental Crimes Section, U.S. Department of Justice, 601 D Street N.W., Washington D.C. 20530. After consultation with the Company, the Monitor may extend the time period for issuance

Exh. 3-7

of the initial report for a brief period of time with prior written approval of the Offices.

13.    Within one hundred fifty (150) calendar days after receiving the Monitor's initial report, the Company shall adopt and implement all recommendations in the report, unless, within sixty (60) calendar days of receiving the report, the Company notifies in writing the Monitor and the Offices of any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable. With respect to any such recommendation, the Company need not adopt that recommendation within the one hundred fifty (150) calendar days of receiving the report but shall propose in writing to the Monitor and the Offices an alternative policy, procedure or system designed to achieve the same objective or purpose. As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within forty-five (45) calendar days after the Company serves the written notice.

14.    In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Offices. The Offices may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement. Pending

such determination, the Company shall not be required to implement any contested recommendation(s).

15. With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred fifty (150) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Offices.

*Follow-Up Reviews*

16. A follow-up review shall commence no later than one hundred and eighty (180) calendar days after the issuance of the initial report (unless otherwise agreed by the Company, the Monitor and the Offices). The Monitor shall issue a written follow-up report within one hundred twenty (120) calendar days of commencing the follow-up review, setting forth the Monitor's assessment and, if necessary, making recommendations in the same fashion as set forth in Paragraph 12 with respect to the initial review. After consultation with the Company, the Monitor may extend the time period for issuance of the follow-up report for a brief period of time with prior written approval of the Offices.

17. Within one hundred twenty (120) calendar days after receiving the Monitor's follow-up report, the Company shall adopt and implement all recommendations in the report, unless, within thirty (30) calendar days after receiving the report, the Company notifies in writing the Monitor and the Offices

Exh. 3-9

concerning any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable. With respect to any such recommendation, the Company need not adopt that recommendation within the one hundred twenty (120) calendar days of receiving the report but shall propose in writing to the Monitor and the Offices an alternative policy, procedure, or system designed to achieve the same objective or purpose. As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within thirty (30) calendar days after the Company serves the written notice.

18. In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Offices. The Offices may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement. Pending such determination, the Company shall not be required to implement any contested recommendation(s). With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred twenty (120) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Offices.

Exh. 3-10

19.   The Monitor shall undertake a second follow-up review not later than one hundred fifty (150) calendar days after the issuance of the first follow-up report. The Monitor shall issue a second follow-up report within one hundred and twenty (120) days of commencing the review, and recommendations shall follow the same procedures described in Paragraphs 16-18.  No later than sixty (60) days before the end of the Term, the Monitor shall submit to the Offices a final written report ("Certification Report"), setting forth an overview of the Company's remediation efforts to date, including the implementation status of the Monitor's recommendations, and an assessment of the sustainability of the Company's remediation efforts.  No later than thirty (30) days before the end of the Term, the Monitor shall certify whether the Company's compliance program, including its policies and procedures, is reasonably designed and implemented to prevent and detect violations of the anti-fraud and environmental laws.

*Monitor's Discovery of Potential or Actual Misconduct*

20.   (a) Except as set forth below in sub-paragraphs (b), (c) and (d), should the Monitor discover during the course of his or her engagement that:

- any defeat device has been designed, installed, or implemented in any vehicle of any kind manufactured by the Company,  and is in use after the date of this Agreement, whether such design, installation or implementation has been accomplished by the Company alone or in

concert with any other person or entity contracting with or working with the Company; or

- the Company has made any materially false statement to any governmental entity, department, agency, or component within the United States, in connection with the certification, sale, offer for sale, importation or introduction of any vehicle or vehicle type

(collectively, "Potential Misconduct"), the Monitor shall immediately report the Potential Misconduct to the Company's General Counsel, Chief Compliance Officer, and/or Audit Committee for further action, unless the Potential Misconduct was already so disclosed. The Monitor also may report Potential Misconduct to the Offices at any time, and shall report Potential Misconduct to the Offices when they request the information.

(b)    In some instances, the Monitor should immediately report Potential Misconduct directly to the Offices and not to the Company. The presence of any of the following factors militates in favor of reporting Potential Misconduct directly to the Offices and not to the Company, namely, where the Potential Misconduct:   (1) poses a risk to public health or safety or the environment; (2) involves senior management of the Company; (3) involves obstruction of justice; or (4) otherwise poses a substantial risk of harm.

(c)     If the Monitor believes that any Potential Misconduct actually occurred or may constitute a criminal or regulatory violation of U.S. law ("Actual Misconduct"), the Monitor shall immediately report the Actual Misconduct to the Offices.  When the Monitor discovers Actual Misconduct, the Monitor shall disclose the Actual Misconduct solely to the Offices, and, in such cases, disclosure of the Actual Misconduct to the General Counsel, Chief Compliance Officer, and/or the Audit Committee of the Company should occur as the Offices and the Monitor deem appropriate under the circumstances.

(d)     The Monitor shall address in his or her reports the appropriateness of the Company's response to disclosed Potential Misconduct or Actual Misconduct, whether previously disclosed to the Offices or not.  Further, if the Company or any entity or person working directly or indirectly for or on behalf of the Company withholds information necessary for the performance of the Monitor's responsibilities and the Monitor believes that such withholding is without just cause, the Monitor shall also immediately disclose that fact to the Offices and address the Company's failure to disclose the necessary information in his or her reports.

(e)     Neither the Company nor anyone acting on its behalf shall take any action to retaliate against the Monitor for any such disclosures or for any other reason.

Exh. 3-13

*Meetings During Pendency of Monitorship*

21.     The Monitor shall meet with the Offices within thirty (30) calendar days after providing each report to the Offices to discuss the report, to be followed by a meeting between the Offices, the Monitor, and the Company.

22.     At least annually, and more frequently if appropriate, representatives from the Company and the Offices will meet together to discuss the Monitorship and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the Offices, including with respect to the scope or costs of the Monitorship.

*Contemplated Confidentiality of Monitor's Reports*

23.     The reports will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the reports could discourage cooperation, or impede pending or potential government investigations and thus undermine the objectives of the Monitorship. For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Offices determine in their sole discretion that disclosure would be in furtherance of the Offices' discharge of their duties and responsibilities or is otherwise required by law.

Exh. 3-14